RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

DATE 5 / 14 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

JEREMY DALE HERALD,                     CIVIL ACTION
            Appellant                   1:11-cv-1546

VERSUS

U.S. COMMISSIONER OF SOCIAL             JUDGE DEE D. DRELL
SECURITY,                               MAGISTRATE JUDGE JAMES D. KIRK
            Appellee


                REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

    On August 31, 2007, Jeremy Dale Herald ("Herald"), then 35

years old, filed applications for disability insurance benefits

("DIB") and supplemental security income benefits ("SSI"), alleging

a disability onset date of April 3, 2007 (Tr. pp. 76, 81) due to

epilepsy and memory problems (Tr. p. 115). Those applications were

denied by the Social Security Administration ("SSA") (Tr. pp. 57).

    A de novo hearing was held before an administrative law judge

("ALJ") on April 15, 2009, at which Herald appeared with a

vocational expert ("VE") and a witness (Tr. p. 27). The ALJ found

that, although Herald suffers from severe impairments of

"intellectual limitations, obsessive-compulsive disorder, headaches

and seizure disorders" (Tr. p. 19), he has the residual functional

capacity to perform a full range of work at all exertional levels

except that he cannot work around hazards, is limited to one, two,

and three step instructions, and he requires limited interaction

with the public (Tr. p. 21). The ALJ concluded that Herald could

do his past relevant work as a stocker (Tr. p. 24) and was not

disabled at any time through the date of his decision on September

28, 2009 (Tr. p. 25).

Herald requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Herald next filed this appeal for judicial review of the ALJ's decision on August 24, 2011, and alleges the following grounds for relief (Doc. 11):

> 1. The ALJ failed to properly evaluate the medical opinion evidence under 20 C.F.R. § 404.1527 and SSR 96-5P.
>
> 2. The ALJ failed to fulfill his heightened duty to an unrepresented claimant to develop the record by failing to obtain intellectual testing recommended by an examining psychologist to evaluate a diagnosis of probable mild mental retardation.
>
> 3. The ALJ failed to evaluate whether Herald meets or equals Listing 12.05 for mental retardation.

The Commissioner responded to Herald's appeal (Doc. 12) and Herald filed a reply (Doc. 13). Herald's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the

work previously done, or any other kind of substantial gainful employment that exists in the national economy.   42 U.S.C. 1382(a)(3).

<div align="center">Summary of Pertinent Facts</div>

<div align="center">1. Medical Records</div>

In December 2006, Dr. Gonzalo I. Hidalgo, a neurologist, examined Herald for complaints of a seizure disorder since about age five (Tr. p. 176).   The seizures were reported as very intermittent, with none occurring after age five until age 21 (Tr. p. 176).   Herald was prescribed Dilantin, which caused a rash and was discontinued, and Primalone, which caused drowsiness and was discontinued (Tr. p. 176).   Herald reported having seizures at age 34, including an episode of blacking out while driving (Tr. p. 176).   Herald reported there is no aura[1] preceding a seizure event, he has no clear recollection afterward, and lights in front of him cause him to shake; Dr. Hidalgo stated they appeared to be generalized tonic/clonic[2] activity (Tr. p. 176).   Herald also

---

[1] An aura is a subjective sensation (as of voices or colored lights or crawling and numbness) experienced before an attack of some nervous disorders (as epilepsy or migraine).   MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Aura, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[2] Tonic-clonic means relating to, marked by, or being a generalized seizure that is initially tonic (marked by or being prolonged muscular contraction) and then becomes clonic (exhibiting, relating to, or involving clonus-a series of alternating contractions and partial relaxations of a muscle that in some nervous diseases occurs in the form of convulsive spasms involving complex groups of muscles and is believed to result from alteration of the normal pattern of motor neuron discharge) and is characterized by the abrupt loss of consciousness

reported a history of headaches, usually affecting the top of his head, with associated numbness in the face when the headache is significantly bad, as well as photophobia, phonophobia, and nausea (Tr. p. 176); Topamax has given Herald significant relief from the headaches (Tr. p. 176).   Dr. Hidalgo diagnosed primary general epilepsy and migraine headaches, and prescribed Topamax, seizure precautions such as no working with dangerous machinery or at high altitudes, showering rather than bathing, and no driving for six months after a seizure (Tr. p. 178).

A brain MRI in December 2006 showed multiple scattered foci of abnormal signal throughout the periventricular white matter without pathological enhancement (Tr. pp. 159, 179).   The radiologist noted it was a nonspecific finding that could represent demyelinating disease or sequela, vasculitis, or infection (Tr. pp. 159, 179). An EEG was normal in both awake and drowsy states (Tr. pp. 170, 180).   In February 2007, Herald reported one episode of dizziness to Dr. Operario; Elavil was discontinued due to drowsiness and Lamictal was prescribed (Tr. p. 174).   In March 2007, Herald reported headaches, numbness and tingling to his head and the side or his face and legs, difficulty sleeping, and restless legs at night; he was prescribed Lamictal and Requip (Tr. p. 173).

Records from the City of Pineville, Herald's former employer (for a road crew) showed Herald resigned in April 2007 for medical

MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Tonic-clonic, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

reasons (Tr. pp. 296-301).

Herald was evaluated by Dr. Mark Operario, an internist, in June 2007 (Tr. pp. 182, 232). Herald reporting having seizures from ages three to eight, then they began again at about age 25 (Tr. p. 1820. Herald stated the seizures were controlled until March 29, 2007, when he had a vehicular accident; from that time the seizures had been uncontrolled (Tr. p. 182). Herald was unable to drive because of the seizures, was very forgetful both in short and long term memory, and had a history of obsessive/compulsive behavior (Tr. p. 182). Herald reported that taking Lamictal and Depakote had helped control his seizures, but he still had petit mal seizure episodes (Tr. p. 182). Taking Requip for his nighttime seizures caused nausea and did not control the seizures, so it was discontinued (Tr. p. 182). Dr. Operario diagnosed seizures and obsessive compulsive disorder, continued Herald's Lamictal and Depakote, and prescribed Citalopram for Herald's obsessive/compulsive disorder (Tr. p. 182). Dr. Operario noted Herald is a chronic smoker and occasionally drinks alcohol (Tr. p. 182). At a follow up appointment, Dr. Operario diagnosed seizures, obsessive compulsive disorder and memory loss, and prohibited Herald from driving (Tr. pp. 190, 228).

In October 2007, Dr. Operario noted Herald had tremors in his hands on action, which were suggestive of essential tremors, and he complained of an inability to sleep at night (Tr. p. 227). In December 2007, noted Herald had been seizure-free for more than six months and advised him he could drive (Tr. p. 226). Dr. Operario

5

discontinued Celexa and prescribed Mirtazapine as well as Lamictal and Depakote (Tr. p. 227). Dr. Operario continued Herald's medications in November 2007, April 2008, and October 2008 (Tr. p. 229).

In October 2007, Dr. James Quillin, Ph.D., a psychologist, evaluated Herald (Tr. p. 192). Dr. Quillin noted Herald's history of compulsive cleaning and hand washing, and reports of depression due to not being able to drive (Tr. p. 192). Dr. Quillin also noted Herald does not sleep well, so he cleans at night and is not tired the next day, his appetite is intact, his energy and interest levels are good, and he enjoys social interaction (Tr. p. 192). Herald reported his restless leg syndrome had resolved, he has occasional headaches, and he has seizures (Tr. p. 193). Herald stated he has an eleventh grade education, he does chores, he worked a year ago on a road crew, he has difficulty managing money, and his ex-wife takes cares of him (Tr. p. 193). Dr. Quillin found Herald appeared to have cognitive impairment, he was oriented to person, place and situation but not to time, his attention and concentration were limited, his remote memory was spotty and his immediate recall was poor, his insight and judgment were poor, he was able to understand and follow simple directions and instructions only, his reading recognition was at the third grade level, he could perform only simple math operations, and his intellectual functions appeared mildly impaired (Tr. p. 193). Dr. Quillin concluded that Herald suffers from seizures, is mildly depressed, may have obsessive features, and has some substantial

6

cognitive impairment, and diagnosed mild depression, NOS, obsessive/compulsive features, the possibility of hypomania, and suspected mental retardation (Tr. p. 193). Dr. Quillin recommended intellectual function studies (Tr. p. 193).

A psychiatric review technique form was filled out by Tom Ray, Ph.D. in October 2007, after reviewing Herald's medical records (Tr. p. 194). Herald was found to have a mild limitation in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (Tr. pp. 194-207). A mental residual functional capacity assessment noted moderate limitations in Herald's ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, and ability to accept instructions and respond appropriately to criticism from supervisors (Tr. pp. 208-211).

In December 2008, Dr. Operario noted Herald's complaints of aching all over, in his knees, feet, shoulders, and elbows, and inability to sleep without an analgesic (Tr. p. 224). Herald had

7

been prescribed Lortab in an emergency room, and Dr. Operario strongly advised Herald not to take any narcotics, and told him to stop overdosing himself with ibuprofen, BC powder, and Tylenol Arthritis (Tr. pp. 224, 269). Dr. Operario noted Herald was working again and was always on his feet, lifting things, but ordered tests to check for inflammatory arthritis (Tr. pp. 224, 271). An ANA test was negative (Tr. pp. 240, 243). Herald reported tingling in his arms and legs in July 2009; Dr. Operario refilled Herald's medications (Tr. pp. 266).

Herald had another brain MRI in March 2009 that had showed lesions which indicated multiple sclerosis (Tr. pp. 220, 291). In April 2009, a CT scan of Herald's neck was normal (Tr. p. 293).

In September 2009, Herald was examined at the LSU Health Sciences Center in Shreveport for complaints of blurry vision, weakness and numbness for a few years, dropping things, difficulty walking, and headaches with photophobia and phonophobia (Tr. p. 303). Herald was hospitalized for tests, and discharged with findings of ataxic gait (tandem gait not achievable), 20/200 visual acuity in the right eye and 20/30 visual acuity in the left eye, right side motor of 3/5 and left side motor of 5/5, decreased sensation in the right upper and lower extremities, and deep tendon reflexes of one plus in the upper extremities, two plus in both knees, and two plus in both ankles (Tr. p. 304). An ANA test in September 2009 was positive (Tr. p. 311), and MRIs of the brain and the cervical spine indicated multiple sclerosis (Tr. pp. 320, 321). An EEG in October 2009 was normal (Tr. p. 307).

In May 2009, Dr. Quillin again evaluated Herald (Tr. p. 256). Dr. Quillin noted Herald was living with his parents, was not working, was driving, could do simple chores, had reasonably good social interaction, and was financially dependent on his parents (Tr. p. 256). Herald was oriented, had impaired attention, somewhat limited concentration, spotty remote memory, poor immediate recall, limited insight, and impaired judgment (Tr. p. 257). Herald was able to follow simple directions and instructions only and had a great deal of difficulty if they were increased in complexity or length, his reading recognition was measured that day at the first grade level, he could perform only simple arithmetic operations, and his intellectual functions were mildly impaired (Tr. p. 257). Dr. Quillin found Herald has stable depression, a history of compulsive behavior with continued compulsive behavior regarding cleanliness (hand washing and frequent showering), and he has a probable cognitive impairment (Tr. p. 257). Dr. Quillin diagnosed dysthymia and obsessive compulsive disorder, compulsive disorder, and probable mental retardation; Dr. Quillin again recommended objective intellectual function studies and stated he suspected Herald's cognitive level would be a significant limiting factor with respect to his functional capabilities (Tr. p. 257). Dr. Quillin stated that Herald needs assistance in managing funds (Tr. p. 257).

Dr. Quillin also filled out an "ability to do work-related activities (mental)" form, and indicated that Herald has moderate limitations in his ability to understand and remember simple

instructions and his ability to carry out simple instructions, and marked limitations in his ability to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and ability to make judgments on complex work-related decisions (Tr. p. 259). Dr. Quillin further found Herald has mild difficulties with interacting appropriately with the public, supervisors, and co-workers, and moderate difficulties with responding appropriately to usual work situations and to changes in a routine work setting (Tr. p. 260).

### 2. Administrative Hearing

At Herald's administrative hearing on April 15, 2009, Herald waived his right to a representative (Tr. pp. 29-30). Herald testified that he was 37 years old, right-handed 5'8" tall, weighed about 160 pounds, and his weight fluctuates by five to ten pounds (Tr. pp. 31-32). Herald testified that he lives with his mother, and before that he lived with his ex-wife and her two children (Tr. pp. 32, 37). Herald testified that he completed the eleventh grade in special education, can read and write, but has a lot of trouble with arithmetic (Tr. pp. 34-35).

Herald testified that he is currently working part time, 20 to 25 hours per week, at the Dollar General store in Pollock, Louisiana, stocking shelves; he had been working there six or seven months (Tr. pp. 32-33). Herald testified he is slow at his job because he has difficulty remembering where things go, but he gets along with his supervisor; Herald testified that he does not unload trucks, but only stocks shelves (Tr. p. 33). Herald testified that

10

he drives a standard transmission truck, and is not sure whether he could work 40 hours per week if it was offered to him (Tr. p. 34).

Herald also testified that he worked for about seven months on a road crew for the City of Pineville, placing signs and patching roads; he did not operate any equipment (Tr. pp. 35-36). Herald testified he stopped working for the City of Pineville because he had a seizure at work, in a truck, and the City did not have any other work for him (Tr. pp. 35-36). Herald testified that he did not remember where he worked before he worked for the City of Pineville (Tr. pp. 36-37). When he stopped working for the City, he was living with his wife, whom he later divorced, then he moved in with his mother (Tr. p. 37). Herald was married about six years (Tr. p. 37).

Herald testified he has a seizure about every six or seven months, but has not had a seizure since he started working at the Dollar General; he has only had "flashes" (Tr. p. 36). Herald testified that he takes his medication twice a day (Tr. p. 36). Herald testified he had an appointment to see a neurologist at the LSU Medical Center in Shreveport (Tr. p. 39).

Herald testified that, on a typical day, when he is not working, he sits at home, mows and rakes the lawn, and helps carry groceries (Tr. p. 39). Herald testified that he gets along with his mother (Tr. p. 39). Herald testified that he smokes about half a pack a day, does not drink, does not go to church, likes to go fishing (from the bank) but prefers not to go alone because of the possibility of a seizure, and does not clean the fish he catches

11

(Tr. pp. 40-41). Herald does chores for his mother, takes care of his personal needs, has zippers on his shoes so he doesn't have to tie laces, is always on time for work, and does not have a checking account; he cashes his paychecks at the bank they are drawn from (Tr. pp. 41-42).

Herald testified that he would like to work full time if he could, but his epilepsy may prevent it (Tr. p. 42). Herald testified that he has headaches three of four days a week, they last almost all day, and he has been having headaches like that for about four months (Tr. p. 42). Herald testified that he used a temporary service to try to get a job at Proctor and Gamble, but they would not hire him because he takes medication twice a day for epilepsy (Tr. pp. 43-44).

Herald's mother, Scotty Lynn Bond ("Bond") testified that she sees Herald every day, and that he has had seizures since he was five; the neurosurgeon had told her Herald would grow out of them (Tr. pp. 44-45), but he started having them again as an adult, a few times a year (Tr. p.45). Bond testified that Herald's seizures hamper him from working because employers do not want "the liability" of employing him; Herald got his job at Dollar General because Bond knew and spoke to the manager (Tr. p. 45). Bond testified that Herald does not do very well some days due to headaches, which cause him to be lethargic (Tr. p. 45).

Bond testified that the last MRI showed Herald has multiple sclerosis, so he was going to the LSU Medical Center in Shreveport for a clinical correlation (Tr. p. 45). The ALJ told Bond to send

12

him the new LSU medical records as soon as possible, and he would send Herald for consultative psychological and intellectual evaluations (Tr. p. 46).

The VE testified Bond's past relevant work as a construction laborer was very heavy (SVP 2, DOT[3] 869.687-026), his past work as a security guard was light (SVP-2, DOT 372.667-038), his past work as a tractor operator was medium (SVP 3, DOT 929.683-014), and his work as a stocker was medium (SVP-4, DOT 299.367-014).

The ALJ posed a hypothetical concerning a person of Herald's age, education and work experience, with no exertional limitations, who is unable to work around hazards and cannot do complex work, but can do one, two and three step occupations with limited interaction with the public, and is more comfortable working with things than with people (Tr. p. 50).

The VE testified that such a person could work as a stocker (2000 jobs in the nation and 100 jobs in Louisiana), or as a janitor/cleaner (Census Code 453, half of the 1,233,669 jobs in the nation and half of the 6,263 jobs in Louisiana) (Tr. pp. 50-51). The VE further testified that, if the person had headaches that interfered with his ability to work and caused him to miss about five days a month, he could not be able to do any work on a sustained basis (Tr. p. 52).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R.

---

[3] Dictionary of Occupational Titles.

13

§416.920(a).  The sequential process required the ALJ to determine whether Herald (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Herald met the insured status requirements for DIB through December 31, 2011, he has not engaged in substantial gainful activity since April 3, 2007, and he has severe impairments of intellectual limitations, obsessive-compulsive disorder, headaches, and seizure disorder, but that he does not have an impairment or combination of impairments listed in

14

or medically equal to one listed in Appendix 1 (Tr. p. 19).  The ALJ found that Herald has the residual functional capacity to do work at all exertional levels but cannot work around hazards, is limited to one, two or three step instructions, and requires limited interaction with the public (Tr. p. 12).  The ALJ then found that, as of September 28, 2009, Herald was still able to do his past relevant work as a stocker (Tr. pp. 24, 26).  The sequential analysis thus ended at Step 4, with a finding that Herald was not disabled at any time through the date of the ALJ's decision (Tr. p. 26).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly

detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

<div align="center">Law and Analysis</div>

## Ground 1 - Medical Opinion Evidence

First, Herald contends the ALJ failed to properly evaluate the medical opinion evidence under 20 C.F.R. § 404.1527 and SSR 96-5P because he gave more weight to the opinion of the non-examining psychologist, Dr. Ray, than to the opinion of the examining psychologist, Dr. Quillin.

The general precepts governing this issue are that the opinion of a treating physician deserves to be given greater weight than

<div align="center">16</div>

that of a non-treating or consulting physician.  <u>Carry v. Heckler</u>, 750 F.2d 479, 484 (5th Cir. 1985).  The treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant.  <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981); <u>Warncke v. Harris</u>, 619 F.2d 412, 416 (5th Cir. 1980); <u>Strickland v. Harris</u>, 615 F.2d 1103, 1109-1110 (5th Cir. 1980).  An acceptable medical opinion as to disability must be supported by clinical or laboratory findings. <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981).

Neither Dr. Ray nor Dr. Quillin was a treating physician-both were employed only for their opinions as to Herald's mental residual functional capacity.  However, Dr. Quillin actually examined Herald twice, while Dr. Ray's opinion was drawn only from a review of Herald's medical records.

Both the law and common sense dictate that the opinion of a psychologist who actually examined the claimant twice (Dr. Quillin) should carry more weight than the opinion of a psychologist whose opinion is based on an early review of the claimant's medical records (Dr. Ray).  On the issue of Herald's residual functional capacity between April 3, 2007 and September 28, 2009, Dr. Quillin examined Herald in 2007 and 2009, while Dr. Ray reviewed Herald's medical records and gave his opinion only in October 2007. Finally, it is noted that, in 2007, Dr. Ray did not refute Dr. Quillin's finding of memory and cognitive impairments, but simply assigned milder degrees of limitations to Herald than Dr. Quillin did.  Dr. Quillin's 2009 diagnosis and opinion are unrefuted.

The ALJ's reason for assigning little weight to Dr. Quillin's opinion of Herald's residual functional capacity was because he did not believe Herald's cognitive and memory impairments were as bad as Dr. Quillin thought they were (Tr. p. 23). An ALJ does not have the medical expertise to substitute his opinion as to the nature of a claimant's medical complaints for the supported and unrefuted diagnosis of a consultative examining physician, particularly one who, as in this case, is a specialist. See Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901, 112 S.Ct. 278 (1991).

Therefore, the ALJ clearly erred in giving more weight to Dr. Ray's opinion than to Dr. Quillin's.

Ground 2 - Unrepresented Claimant

Next, Herald contends the ALJ failed to fulfill his heightened duty to an unrepresented claimant to develop the record by failing to obtain the intellectual testing recommended by an examining psychologist (Dr. Quillin) to evaluate a diagnosis of probable mild mental retardation.

The ALJ's obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedure appears before him. This duty requires the ALJ to scrupulously and conscientiously probe into, inquire and explore for all relevant facts. The failure of the ALJ to develop an adequate record is not, however, ground for reversal per se. As in the case of hearing held without waiver of the right to counsel, the claimant must, in addition, show that he was prejudiced as a

18

result of a scanty hearing. He must show that, had the ALJ done his duty, he could and would have adduced evidence that might have altered the result. If the plaintiff's subjective symptoms are linked to a medically determinable component, the ALJ is required to consider the symptoms and emotions of the claimant; it is the duty of the ALJ to inquire further in the existence or nonexistence of distress sufficient to be disabling. The duty does not exact a lengthy hearing or protracted inquiry. It does exact a careful effort to make a complete record. Kane v. Heckler, 731 F.2d 1216, 1219-20 (5th Cir. 1984), and cases cited therein. Also, Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991); James v. Bowen, 793 F.2d 702, 704 (5th Cir. 1981). The ALJ has the duty to develop the relevant facts so that he could fully and fairly evaluate the case. James, 793 F.2d at 705. If the ALJ fails in this duty, he does not have before him sufficient facts on which to make an informed decision and consequently the decision is not supported by substantial evidence. James, 793 F.2d at 704.

The court will not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000). To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result. Carey, 230 F.3d at 142.

Herald was unrepresented at the administrative hearing. The ALJ told Herald and his mother that he would obtain a consultative

exam to determine Herald's mental and intellectual functioning. However, the ALJ only asked Dr. Quillin to evaluate Herald's mental status, despite the fact that Dr. Quillin had recommended that Herald's obviously impaired intellectual functioning be objectively tested in 2007 and again recommended it in 2009. The ALJ stated in his decision that Herald's cognitive impairments appeared "suddenly" in June 2007 without any reason, and therefore he did not believe Herald has a cognitive impairment to the extent described by Dr. Quillin.

Perhaps the ALJ overlooked the fact that Herald attended special education classes in school and did not complete high school. Or perhaps the ALJ overlooked the fact that Herald reported a vehicular accident in 2007 which precipitated the onset of uncontrolled seizure activity.

Whatever the reason, the ALJ obviously substituted his non-expert opinion for Dr. Quillin's expert psychology opinion in finding Herald does not have memory problems as described by Dr. Quillin and does not have a significant cognitive impairment (Tr. p. 20). As stated above, the ALJ erred in then relying on the opinion of a non-examining consultant, Dr. Ray, who did not have the opportunity to personally evaluate Herald's memory and cognitive impairments and mental functional limitations.

Had the ALJ fulfilled his duty to the unrepresented Herald, to fully and fairly develop the evidence by ordering intellectual functioning tests to evaluate Herald's IQ, the ALJ would not have tried to second-guess Dr. Quillin's opinion. The issue would have

been settled one way or another.

Finally, without intellectual functioning tests, the ALJ could not possibly have determined whether or not Herald meets Listing 12.05; the results of such tests are required for that listing. That issue is discussed below.

Since there is substantial evidence in the record to show that Herald has impaired intellectual functioning, the ALJ should have had his intellectual functioning properly evaluated to fully and fairly develop the record and settle the issues as to the extent of Herald's intellectual impairments.  Without the results of such tests, the ALJ could not properly determine whether or not Herald meets a listing and could not properly evaluate his residual mental functional capacity.

Therefore, substantial evidence does not support the ALJ's/Commissioner's findings as to Herald's residual functional capacity and ability to work, and their conclusion that Herald is not disabled.

Ground 3 - Listing 12.05

Herald also contends the ALJ failed to evaluate whether Herald meets or equals Listing 12.05 for mental retardation.  The ALJ evaluated both Listing 12.02 and 12.06, but did not review Listing 12.05.

Listing 12.05, Mental Retardation, states,

"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
"The required level of severity for this disorder is

21

met when the requirements in A, B, C, or D are satisfied.
    "A. Mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
OR
    "B. A valid verbal, performance, or full scale IQ of 59 or less;
    "C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
OR
    "D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. marked difficulties in maintaining social functioning; or
3. marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration."

As discussed, above, the ALJ should have ordered intellectual testing as recommended by Dr. Quillin in 2007 and 2009. Then Listing 12.05 could have been reviewed.

Moreover, the Appeals Council erred in finding Herald's additional medical evidence from September 2009, as to his multiple sclerosis, that was submitted after the ALJ issued his decision in September 2009 but well before the Appeals Council decision in October 2011, did not alter the ALJ's findings. It appears Herald may meet Listing 11.09B for multiple sclerosis: "B. Visual or mental impairment as described under the criteria in 2.02, 2.03 2.04, or 12.02."[4]  The March 2009 MRI indicated that Herald has

---

[4]  Listing 12.02, Organic Mental Disorders, states:
    Psychological or behavioral abnormalities associated with a dysfunction of the brain.  History and physical examination or laboratory tests demonstrate the

22

multiple sclerosis (Tr. pp. 220, 291), and the September 2009

medical evidence established conclusively that Herald has multiple

sclerosis (Tr. pp. 320, 321).  The physical exam in September 2009

(ataxic gait-tandem gait not achievable, 20/200 visual acuity in

the right eye and 20/30 visual acuity in the left eye, right side

motor of 3/5 and left side motor of 5/5, decreased sensation in the

<div style="margin-left:2em">

presence of a specific organic factor judged to be
etiologically related to the abnormal mental state and
loss of previously acquired functional abilities.
     The required level of severity for these disorders is
met when the requirement in both A and B are satisfied,
or when the requirements in C are satisfied.
     A.   Demonstration of a loss of specific cognitive
abilities or affective changes and the medically
documented persistence or at least one of the
following:
                    *              *              *
          2. Memory impairment, either short term
          (inability to learn new information),
          intermediate, or long-term (inability to
          remember information that was known sometimes
          in the past);
                    *              *              *
AND
B. Resulting in at least two of the following:
          1. Marked restriction of activities of daily
          living; or
          2. Marked difficulties in maintaining social
          functioning; or
          3. Marked difficulties in maintaining
          concentration, persistence or pace;... .

</div>

There is medical evidence as to Herald's limited long memory
and poor short term memory.  A brain MRI in December 2006 showed
multiple scattered foci of abnormal signal throughout the
periventricular white matter without pathological enhancement,
and the radiologist noted it was a nonspecific finding that could
represent demyelinating disease or sequela or vasculitis or
infection (Tr. pp. 159, 179).  Dr. Operario diagnosed memory loss
in June 2007, and noted Herald's ex-wife's statements about
Herald's history of forgetfulness (Tr. pp. 190, 228).  In October
2007 and May 2009, Herald did not do well on Dr. Quillin's memory
tests, so he noted Herald's memory impairments (although the ALJ
discounted his opinion).  MRIs of Herald's brain in March and
September 2009 showed lesions on his brain which indicated
multiple sclerosis.

right upper and lower extremities, and deep tendon reflexes of one plus in the upper extremities, two plus in both knees, and two plus in both ankles (Tr. p. 304)) appears to show that Herald meets Listing 11.09, due to the "A. Disorganization of motor function as described in 11.04B." Listing 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."

Finally, it is noted that the Appeals Council should have found that Herald's difficulty walking (ataxic gait, tandem gait not achievable), diagnosed in September 2009, changed the ALJ's finding that Herald did not have any exertional limitations and could perform work at all exertional levels. The Appeals Council erred in failing to find the evidence of Herald's exertional limitations significantly affected the ALJ's findings as to Herald's residual functional capacity.

Therefore, substantial evidence does not support the ALJ's/Commissioner's conclusion that Herald does not meet or equal a listing, and the Appeals Council erred in finding Herald's September 2009 medical evidence did not change the ALJ's findings and conclusions.

<u>Remand</u>

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law. However, this does not entitle Herald to a decision in his favor based upon the existing record. The record is simply

24

inconclusive as to whether Herald meets a listing or whether there are any jobs existing in sufficient numbers in the national economy which Herald can perform, given his true impairments.  Therefore, Herald's case should be remanded to the Commissioner for further proceedings, including intellectual function tests, consideration of all the evidence, re-evaluation of whether Herald meets a listing, and re-evaluation of Herald's residual functional capacity.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Herald's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

25

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

    THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____

day of May 2012.

<div align="right">

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

</div>